**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **ANDREW BROOKS,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:20-CV-85** |
| | ) | |
| **HARTFORD LIFE & ACCIDENT** | ) | |
| **INSURANCE COMPANY,** | ) | |
| **Defendant.** | ) | |

# MEMORANDUM OPINION

At issue in this Employee Retirement Income Security Act of 1974 ("ERISA") case on cross motions for judgment on the record is whether Defendant Hartford Life & Accident Insurance Company properly exercised its discretion in determining that Plaintiff Andrew Brooks was not entitled to long term disability ("LTD") benefits for disability due to both physical and mental conditions. This matter has been fully briefed and argued and is now ready for disposition. For the reasons stated below, defendant's motion for judgment on the record must be granted in part and denied in part, and plaintiff's motion for judgment on the record must be denied.[1] Specifically, because defendant's determination that plaintiff was no longer disabled due to a physical disability was the result of a deliberate, principled reasoning process and supported by substantial evidence, that decision must be upheld. However, because defendant's determination that plaintiff was not disabled due to a mental condition failed to satisfy the notice requirement of ERISA, that determination must be remanded to the plan administrator.

[1] Although plaintiff styles his motion as a motion for summary judgment, it is more appropriately considered a motion for judgment on the record.

# I.

The following findings of fact are derived from the record in this case:

- From November 2010 to September 24, 2012, plaintiff was employed by PricewaterhouseCoopers LLP ("PwC") as an "experience associate." In that position, plaintiff was "responsible for helping clients realize competitive advantage from operations, translating business strategies into operations strategies, product innovation and development, sales and operations planning, procurement and sourcing, manufacturing operations, service operations, logistics, and capital programs." Employability Analysis Report, Administrative Record ("AR") 986. Plaintiff's position was considered to be sedentary to light.

- As an employee of PwC, plaintiff participated in a group insurance policy GLT-673035 ("the Group Policy") issued by defendant. As an employer-provided insurance policy, the Group Policy is governed by ERISA, 29 U.S.C. § 1001 *et seq*.

- As relevant to this case, the Group Policy was issued by defendant, effective July 1, 1999, to pay LTD and other related benefits to claimants who meet the conditions of the Group Policy. The Group Policy grants defendant "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions." Group Policy, AR 1874.

- The Group Policy states that a claimant has a disability when the claimant is prevented by:

  > (1) accidental bodily injury; (2) sickness; (3) Mental Illness; (4) Substance Abuse; or (5) pregnancy, from performing one or more of the Essential Duties of Your Occupation, and as a result Your Current Monthly Earnings are no more than 80% of Your Indexed Pre-disability Earnings. After [the first 60 months], You must be so prevented from performing one or more of the Essential Duties of Any Occupation.

  *Id.* at AR 1855.

- The Group Policy limits disability benefits for those disabled by mental illness, stating that if the claimant is disabled because of "Mental Illness that results from any cause" or "any condition that may result from Mental Illness" then "benefits will be payable a total of 24 months." *Id.* at AR 1866.

- The Group Policy defines mental illness as:

  > [A]ny psychological, behavioral or emotional disorder or ailment of the mind, including physical manifestations of psychological, behavioral or emotional disorders, but excluding demonstrable, structural brain damage.

*Id.* at AR 1867.

- The Group Policy further states that LTD benefits are only payable if the claimant is under the regular care of a physician and if the claimant submits satisfactory proof of loss, including, but not limited to documentation of the date, case, and prognosis of the disability medical information, and evidence that the claimant is under the regular care of a physician. *Id*. at AR 1861, 1865, 1871.

- On March 1, 2012, plaintiff was in a car accident in Maryland. In the accident, a vehicle ran a red light and impacted plaintiff's car at the driver's side rear window. As a result, plaintiff hit his head on the driver's side window but was otherwise uninjured.[2]

- Immediately after the accident, plaintiff was able to call 911, exit the vehicle, and take photographs of the scene before emergency personnel arrived. Plaintiff was then taken by ambulance to Shady Grove Adventist Hospital.

- At the hospital, plaintiff underwent tests and physical examinations. In this regard, an x-ray of plaintiff's cervical spine and an axial CT scan were performed, neither of which found evidence of a fracture or dislocation. Plaintiff was discharged a few hours later with a diagnosis of a head contusion and sprain to the neck and back.

- A month later, on March 30, 2012, plaintiff visited Jon Peters, M.D., and reported feeling "very foggy and fuzzy headed." Medical Examination of Jon Peters, M.D., AR 1679, 1687. Dr. Peters concluded that plaintiff was suffering a "closed head injury" and a "mild concussive injury to the brain," and that plaintiff was suffered from "mild post[-]concussive symptoms including headaches and cognitive difficulties." *Id*. Dr. Peters recommended that plaintiff have an MRI of the brain and a "sleep deprived EEG," and plaintiff did so. A review of the results of both tests were "unremarkable." *Id*. at AR 1686.

- In a series of appointments with Dr. Peters from March 2012 to January 2013, plaintiff reported difficulty with mood and affect control, headaches, trouble with memory and reading retention, and difficulty concentrating. Dr. Peters also noted symptoms of anxiety and difficulty with anger management, at one point finding it necessary to advise plaintiff "if he did not compose himself, [they] would have to terminate [the] meeting." AR 1681.

---

[2] In his memorandum in support of his motion for judgment on the record, as well as in a number of his later medical examinations, plaintiff reported that plaintiff "briefly lost consciousness" during the accident. *Pl. Mem. in Support of Mot. for J. on the Record*, 4; *see also* Neuropsychological Evaluation Report of Jack Spector, Ph.D., AR 1008, 1009 (noting that the car accident "was marked by a 'one second' loss of consciousness"). However, plaintiff's Patient Care Report from his emergency room visit after the accident does not mention any loss of consciousness, and in a review of plaintiff's medical history with Jon Peters, M.D., a month after the accident, plaintiff reportedly told Dr. Peters that he "d[id] not think he was knocked out" in the accident. Medical Examination of Jon Peters, M.D., AR 1679, 1687; *see also* Emergency Room Patient Care Report, AR 1718.

- During this time period, plaintiff reported seeing eight medical professionals in addition to Dr. Peters, including a neuropsychologist, a cognitive rehab therapist, and a mental health counselor, all of whom Dr. Peters recommended, as well as a neuropsychiatrist, an acupuncturist, a chiropractor, an osteopath, and a massage therapist.

- The neuropsychologist, David Hebda, Ph.D., performed an array of tests on plaintiff. From those tests, Dr. Hebda determined that plaintiff had a general cognitive ability in the superior range, but that plaintiff had deficits in processing verbal information, attention skills for visual information, and immediate verbal learning and memory. Dr. Hebda also noted an additional concern related to plaintiff's personality testing, which Dr. Hebda found to be indicative of "a person with significant thinking and concentration problems, accompanied by prominent hostility, resentment, and suspiciousness." Medical Examination of David Hebda, Ph.D., AR 1645. Dr. Hebda concluded that "it is likely that [plaintiff's] traumatic brain injury is the primary contributing factor to his processing delays and attentional deficits." *Id*.

- Both Dr. Hebda and Dr. Peters recommended that plaintiff visit a cognitive rehab therapist and a mental health counselor. Plaintiff did so, but afterward reported to Dr. Peters that plaintiff would not return to see either of them. Dr. Peters prescribed a mood stabilizer for plaintiff, but plaintiff expressed reluctance to take any medication.

- Despite plaintiff's continued cognitive and physical difficulties, plaintiff continued to work until September 24, 2012. At that time, plaintiff applied for short term disability with the support of Dr. Peters. Defendant approved plaintiff's application on October 24, 2012, with benefits effective starting on September 25, 2012.

- Plaintiff received short term disability benefits through March 25, 2013, and on April 1, 2013, defendant approved plaintiff's application for LTD benefits. Plaintiff was eligible for and received LTD benefits through February 5, 2019, when defendant terminated plaintiff's LTD benefits.[3]

- On April 22, 2016, in connection with plaintiff's workers' compensation claim, plaintiff underwent a medical examination performed by Donald G. Hope, M.D. Dr. Hope observed that plaintiff drove himself to the examination and that, although plaintiff quantified his pain level as seven out of ten, plaintiff displayed "no evidence whatsoever of manifestation of pain." Medical Examination of Donald G. Hope, M.D., AR 1382, 1383. Dr. Hope believed that plaintiff's pain seemed staged. Based on plaintiff's medical records and an examination of plaintiff, Dr. Hope concluded that he saw "nothing" to support that plaintiff "has any residual of concussion or post[-]concussive syndrome." *Id.* at AR 1397.

[3] Plaintiff's LTD benefits were briefly terminated three times throughout the period due to issues relating to documentation of plaintiff's proof of loss and plaintiff's attending physician's statements as well as plaintiff's refusal to participate in an independent medical examination. On each occasion, plaintiff's LTD benefits were reinstated after a brief period.

- Beginning in March 2018, the requirements for plaintiff to continue to receive LTD benefits changed under the terms of the Group Policy. Specifically, from that point on plaintiff was required to meet a more stringent definition of disability, namely that he was unable to perform one or more of the essential duties of "any occupation," in order to continue to receive LTD benefits.[4]

- In response to that change, on March 28, 2018, Michael Porvaznik, D.O., who had been treating plaintiff since September 2012, sent a letter to defendant averring that plaintiff was totally disabled by traumatic brain injury and post-concussive syndrome resulting from the March 1, 2012 car accident, and was incapable of performing any job or occupation.

- In Dr. Porvaznik's letter to defendant, Dr. Porvaznik described plaintiff's symptoms as including: chronic debilitating pain, soft tissue injuries related to a herniated disc, knee, shoulder, neck, and back, emotional issues, lack of motivation, chronic fatigue, anxiety, and depression. Dr. Porvaznik concluded by stating that his "firm medical opinion and belief" was that "[plaintiff's] symptoms are authentic and genuine, consistent with, and directly caused by the traumatic brain injury he suffered from the work[-]related car accident." Letter from Michael Porvaznik, D.O., AR 1207, 1210-11.

- On July 26, 2018, defendant initiated a review of plaintiff's case to determine whether plaintiff continued to be eligible for LTD benefits under the more stringent definition of disability applied after the first five years of LTD benefits under the terms of the Group Policy.

- As part of that review, plaintiff underwent an independent medical examination by Jack Spector, Ph.D. In addition to performing a medical examination on October 12 and 15, 2018, Dr. Spector reviewed plaintiff's medical records and reports from: Jon Peters, M.D., Charles Moseley, M.D., Michael Porvaznik, D.O., David Hebda, Ph.D., Earl Durant, LPC, Leah Kroeger, M.D., and Donald Hope, M.D., as well as administrative records from defendant. In his Neuropsychological Evaluation Report, Dr. Spector made the following observations and conclusions:

    - Dr. Spector noted that plaintiff was "obstreperous and agitated" through much of the medical exam and refused to answer a number of questions pertaining to plaintiff's family, academic, vocational, and psychosocial history. Dr. Spector further reported that plaintiff "never seemed far from quitting the present examination all together, which in turn kept [Dr. Spector] from pressing [plaintiff] during interview." Neuropsychological Evaluation Report of Jack Spector, Ph.D., AR 1008, 1009.

    - During psychological and cognitive testing, plaintiff was observed to "exaggerate[]

[4] As described above, for the first five years of receiving LTD benefits, plaintiff had to demonstrate only that he was disabled from performing one or more of the essential duties of his own occupation.

cognitive and functional impairment." *Id*. at AR 1014. However, despite the fact that plaintiff "did not consistently exhibit his best possible performance during testing," Dr. Spector concluded that plaintiff was not malingering or feigning impairment. *Id*.

- Plaintiff's psychological testing revealed "very high levels of emotional distress, compounded by what appears to have been a consistent exaggeration of physical and emotional symptoms and complaints." *Id*. at AR 1015. Although the testing was "undermined" by plaintiff's "dramatic, obstreperous, and essentially uncooperative manner," Dr. Spector found that plaintiff had "very high levels of somatization and evidence of extreme affective distress, in the context of significant character pathology, the latter with paranoid and explosive features." *Id*.[5]

- Dr. Spector concluded that plaintiff "appear[ed] to have sustained no worse than a mild traumatic brain injury in his 2012 motor vehicle accident." *Id*. at AR 1018. Nonetheless, Dr. Spector stated that he could not imagine plaintiff "successfully negotiating the interpersonal requirements of any social milieu, and [Dr. Spector] did not observe comportment consistent with functioning in any workplace environment." Dr. Spector noted that it was "possible that aspects of [plaintiff's] grossly aberrant clinical presentation were exaggerated or contrived." *Id*. at AR 1017. However, Dr. Spector further stated that "[i]f pressed, [Dr. Spector] would opine that at least a portion of [plaintiff's] inappropriate and/or maladaptive behaviors are outside [plaintiff's] control, and represent a genuine limitation with respect to functioning." *Id*. at AR 1018.

- Dr. Spector emphasized that he "d[id] not believe[] that the uncomplicated concussion [plaintiff] *might* have sustained in 2012 [wa]s in any way responsible for [plaintiff's] current symptoms, complaints, and performance." *Id*. (emphasis in original). Instead, Dr. Spector concluded that "pre-existing or characterologic psychiatric factors are the primary cause of what impairments exists," which Dr. Spector believed "pre-existed or are unrelated to [plaintiff's] injury." *Id*.

- In summary, Dr. Spector concluded that plaintiff's symptoms were unrelated to the 2012 car accident. Instead, Dr. Spector diagnosed plaintiff with "[u]ndifferentiated somatoform disorder," "[d]ysthymic disorder,"[6] and "[o]ther (mixed) personality

---

[5] Somatoform disorder, or somatic symptom disorder, is characterized by "an extreme focus on physical symptoms—such as pain or fatigue—that causes major emotional distress and problems functioning." MAYO CLINIC, *Somatic Symptom Disorder* (last visited Mar. 10, 2021), https://www.mayoclinic.org/diseases-conditions/somatic-symptom-disorder/symptoms-causes/syc-20377776.

[6] Dysthymia is "a continuous long-term (chronic) form of depression." MAYO CLINIC, *Somatic Symptom Disorder* (last visited Mar. 10, 2021), https://www.mayoclinic.org/diseases-conditions/persistent-depressive-disorder/symptoms-causes/syc-20350929.

disorder with Cluster B traits,"[7] in addition to "[p]sychological factors affecting another medical condition," namely the physical injuries sustained as a result of the car accident. *Id*. at AR 1019.

- On November 28, 2018, defendant conducted an employability analysis for plaintiff, taking into account plaintiff's history as well as Dr. Spector's evaluation. Defendant concluded that "occupations exist in reasonable numbers in the national economy and are within [plaintiff's] physical abilities." Employability Analysis Report, Nov. 28, 2018, AR 986, 989.

- In response to Dr. Spector's evaluation, plaintiff's treating physician, Dr. Porvaznik, wrote a letter dated November 29, 2012 disagreeing with Dr. Spector's conclusions. In his letter, Dr. Porvaznik wrote that he continued to believe that plaintiff was "totally disabled from a traumatic brain injury (TBI)" and that Dr. Porvaznik did "not see [plaintiff] making much improvement, if any, in the future." Letter from Michael Porvaznik, D.O., to Defendant, Nov. 29, 2018, AR 972, 974.

- Dr. Porvaznik offered the following rebuttal to Dr. Spector's conclusions:

  > It may seem that [plaintiff's] mild TBI was a mild head injury to some people like Dr. Spector[,] and [that plaintiff] should have healed by now. But [plaintiff] hasn't. Therefore I would say that [plaintiff's] injury was not "mild," but severely life-changing. [Plaintiff] is outside of the bell curve and must be considered permanently disabled. . . . All of [plaintiff's] symptoms and pain came on after [the car] accident. This timeline must be honestly observed and respected. . . . Therefore, in my clinical judgment [plaintiff] suffered a TBI in the accident of March 1, 2012. It was severe and [plaintiff's] life is altered to this day. In my opinion [plaintiff] is disabled and unable to work. [Plaintiff] has reach his level of maximum improvement.

  *Id*. at AR 974-75.

- Based on Dr. Spector's independent medical examination, the employability analysis, and a review of plaintiff's record, defendant determined that plaintiff "no longer [met] the definition of Disability due to a physical condition." Initial Denial Letter, Nov. 30, 2018, AR 373, 373. However, defendant concluded that plaintiff did meet the Group Policy's definition of disability due to mental conditions. Importantly, the Group Policy limits the maximum duration of LTD benefits for mental conditions to twenty-four months.

---

[7] A personality disorder is "a type of mental disorder in which you have a rigid and unhealthy pattern of thinking, functioning and behaving." Cluster B personality disorders are characterized by "dramatic, overly emotional or unpredictable thinking or behavior." MAYO CLINIC, *Personality Disorders* (last visited Mar. 10, 2021), https://www.mayoclinic.org/diseases-conditions/personality-disorders/symptoms-causes/syc-20354463.

- Defendant made this determination based on a review of "[a]ll the papers contained in [plaintiff's] file," including the employability analysis and medical records and reports from Jack Spector, Ph.D., Jon Peters, M.D., Charles Moseley, M.D., Michael Porvaznik, D.O., Earl Durant, LPC, and Donald Hope, M.D. *Id*. at AR 375-76.[8]

- On November 30, 2018, defendant sent plaintiff the Initial Denial Letter informing plaintiff of defendant's determination. Both in this letter, and in a later, January 2, 2019 letter, defendant requested updated medical information to assess ongoing benefit eligibility and to verify that plaintiff remained under the regular care of a physician for his mental condition, as required by the Group Policy. Plaintiff did not provide defendant with that information, so in a February 5, 2019 letter, defendant notified plaintiff that defendant had terminated plaintiff's LTD benefits for failure to provide proof of loss.

- On May 29, 2019, plaintiff, by counsel, informed defendant that plaintiff was appealing defendant's November 30, 2018 determination that plaintiff was not disabled due to a physical condition. In the materials for plaintiff's appeal, plaintiff's counsel argued both that plaintiff continued to be disabled due to a physical condition and that plaintiff was not disabled due to a mental condition.[9]

- In his appeal, plaintiff also included a review of plaintiff's medical records by clinical neuropsychologist Jeffrey Wilken, Ph.D. In his review, Dr. Wilken asserted that "[t]he conclusions from [Dr. Spector's] report [were] completely contradictory when compared to virtually all information from [plaintiff's] medical history regarding his 2012 [car accident]." Medical Record Review of Jeffrey Wilken, Ph.D., July 11, 2019, AR 826, 836. Dr. Wilken also claimed that neuropsychological evaluations are "notoriously limited with respect to detection of behavioral change associated with brain injury." *Id*. at AR 838. Nonetheless, Dr. Wilken, a neuropsychologist, concluded that it was "clear that [plaintiff] experienced a concussion as a result of his 2012 [car accident] that resulted in neurocognitive decline, behavioral deterioration, and psychiatric/psychological impairment." *Id*. at AR 839.

- Upon review of plaintiff's appeal, defendant requested three independent reviews of plaintiff's medical records. Reviews were undertaken by: (i) Jason Sebesto, D.O., a specialist in neurology and psychiatry; (ii) Sarah M. White, M.D., a specialist in physiatry; and (iii) Scott W. Sautter, Ph.D., a specialist in neuropsychology.

---

[8] Defendant's Initial Denial Letter did not take into account Dr. Porvaznik's November 29, 2018 Letter. However, on December 10, 2018, defendant sent a letter to plaintiff advising plaintiff that defendant had reviewed Dr. Porvaznik's letter, and that defendant's decision was unchanged because Dr. Porvaznik provided "no new information" to counter Dr. Spector's findings. Letter regarding Dr. Porvaznik's Letter, Dec. 10, 2018, AR 368, 370.

[9] *See* Pl. Letter with Additional Material for the Appeal, Aug 2, 2019, AR 806, 809 ("You say Mr. Brooks is now disabled due to a mental health condition, as diagnosed by Dr. Spector based on the neuropsychological evaluation. **We disagree with that**.") (emphasis in original).

- In Dr. Sebesto's review, Dr. Sebesto asserted that plaintiff's medical record "d[id] not support any functional restrictions/limitations" to plaintiff's work. Medical Record Review of Jason Sebesto, D.O., Aug. 21, 2019, AR 663, 666. Dr. Sebesto concluded that, "[f]rom a neurologic perspective, [plaintiff's medical record] supports that [plaintiff] is able to sustain a standard 40-hour week." *Id*.

- In Dr. White's review, Dr. White found that Dr. Porvaznik's opinion regarding plaintiff's functionality and plaintiff's self-reported inability to work were "inconsistent with the clinical findings." Medical Record Review of Sarah M. White, M.D., Aug. 21, 2019, AR 669, 673. Dr. White found that plaintiff's abilities were sustainable for a forty-hour work week with a limitation on plaintiff carrying more than twenty-five pounds occasionally and ten pounds frequently based on plaintiff's pain and back condition.

- In Dr. Sautter's review, Dr. Sautter concluded that there was "no substantive evidence" to support cognitive or behavioral health restrictions and limitations from October 15, 2018, the date of Dr. Spector's medical report. Medical Record Review of Scott W. Sautter, Ph.D., Aug. 22, 2019, AR 657, 660. Dr. Sautter asserted that there were "significant inconsistencies throughout the record regarding the uncomplicated concussion" plaintiff suffered, which Dr. Sautter claimed "do not result in persistent post-concussion symptoms." *Id*. at AR 661.

- On August 27, 2019, defendant prepared an addendum to its previous employability analysis based on the restrictions cited as necessary by Dr. White. Defendant determined that despite those limitations, "occupations [including plaintiff's own occupation] exist in reasonable numbers in the national economy and are within [plaintiff's] physical abilities." Addendum to Employability Analysis Report, Aug. 27, 2019, AR 633, 635.

- On August 30, 2019, defendant sent a Final Denial Letter to plaintiff upholding its determination that plaintiff was not disabled based on a physical disability. Defendant based this decision on "all documents contained in [plaintiff's] claim file," including the employability analysis and the medical record reviews of Dr. Wilken, Dr. Sebesto, Dr. White, and Dr. Sautter. Final Denial Letter, Aug. 30, 2019, AR 344, 344. The appeal review was conducted "independent[ly] . . . from the individuals who made the original decision without deference to that decision." *Id*.

- In the Final Denial Letter, defendant also concluded that "[t]he weight of the evidence does not support that [plaintiff] met the Plan definition of Disabled from Any Occupation" for plaintiff's mental condition. *Id*. at 349. Therefore, defendant asserted that the "claim decision [to discontinue benefits on February 5, 2019 based on plaintiff's failure to provide proof of loss] is rendered moot." *Id*.

On January 24, 2020, plaintiff brought this action alleging that defendant had not complied with the Group Policy and the requirements of ERISA. 29 U.S.C. § 1001 *et seq*. Specifically,

plaintiff alleges that defendant abused its discretion in finding that plaintiff was not disabled due to either a physical condition or a mental condition. On September 25, 2020, the parties filed the instant cross motions for judgment on the record.

**II.**

When addressing a challenge to a denial or termination of benefits under an ERISA plan, reviewing courts must apply a "*de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Here, the Group Policy does precisely this; the Group Policy provides defendant, the plan administrator, with "full discretion." Group Policy, AR 1874. It is therefore necessary to decide "only the contractual questions of whether the administrator exceeded its power or abused its discretion because only those inquiries are relevant to whether the administrator's decision breached the contractual provision." *Griffin v. Hartford Life & Accident Ins. Co.*, 898 F.3d 371, 378 (4th Cir. 2018) (quoting *Firestone*, 489 U.S. at 111).[10]

For courts to determine whether the plan administrator, here defendant, exceeded its discretion, the Fourth Circuit has identified eight nonexclusive factors for courts to consider. *See Helton v. AT&T Inc.*, 709 F.3d 343, 353 (4th Cir. 2013). These factors, first enunciated in *Booth*

---

[10] The Supreme Court identified some of the benefits of this deference, stating that:

> Deference promotes efficiency by encouraging resolution of benefits disputes through internal administrative proceedings rather than costly litigation. It also promotes predictability, as an employer can rely on the expertise of the plan administrator rather than worry about unexpected and inaccurate plan interpretations that might result from *de novo* judicial review. Moreover, . . . deference serves the interest of uniformity, helping to avoid a patchwork of different interpretations of a plan.

*Conkright v. Frommert*, 559 U.S. 506, 517 (2010).

*v. Wal-Mart Stores, Inc. Assocs. Health and Welfare Plan*, are as follows:

> (1) the language of the plan;
>
> (2) the purposes and goals of the plan;
>
> (3) the adequacy of the materials considered to make the decision and the degree to which they support it;
>
> (4) whether the [plan administrator's] interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan;
>
> (5) whether the decision[-]making process was reasoned and principled;
>
> (6) whether the decision was consistent with the procedural and substantive requirements of ERISA;
>
> (7) any external standard relevant to the exercise of discretion; and
>
> (8) the [plan administrator's] motives and any conflict of interest it may have.

201 F.3d 335, 342–43 (4th Cir. 2000).[11]

As the Fourth Circuit has explained, "a trustee's discretionary decision will not be disturbed if reasonable, even if the court itself would have reached a different conclusion." *Booth*, 201 F.3d at 341. Additionally, the Fourth Circuit has articulated that "[u]nder the abuse of discretion standard, the plan administrator's decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 788 (4th Cir. 1995). And, as the Fourth Circuit has made clear, substantial evidence is "more than a scintilla but less than a preponderance." *Newport News Shipbuilding & Dry Dock Co. v. Cherry*, 326 F.3d 449, 452 (4th Cir. 2003) (quoting *Norfolk*

---

[11] In *Metropolitan Life Ins. v. Glenn*, the Supreme Court confirmed this analysis of a potential conflict of interest, stating that "a conflict should be weighed as a factor in determining whether there is an abuse of discretion" rather than changing the applicable standard of review. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008) (quoting *Firestone*, 489 U.S. at 115) (quotation marks removed).

*Shipbldg. and Drydock Corp. v. Faulk,* 228 F.3d 378, 380-81 (4th Cir. 2000)). With respect to the scope of review in ERISA cases, the Fourth Circuit has also made clear that under the more deferential abuse of discretion standard, consideration of evidence outside of the administrative record is generally inappropriate. *See Helton v. AT&T Inc.*, 709 F.3d 343, 352 (4th Cir. 2013). However, "a district court may consider evidence outside of the administrative record on abuse of discretion review in an ERISA case when such evidence is necessary to adequately [sic] assess the *Booth* factors and the evidence was known to the plan administrator when it rendered its benefits determination." *Id*. at 356. It is not necessary to consider outside evidence in this case, and in any event, neither party has asserted that additional evidence is necessary in this case.

Therefore, in order to overturn defendant's decision in this case, it would be necessary to find that defendant's decision was not the result of a deliberate, principled reasoning process or was not supported by substantial evidence.

**III.**

As an initial matter, it is necessary to address the shift in defendant's reasoning between the Initial Denial Letter and the Final Denial Letter. As discussed above, in the Initial Denial Letter defendant determined that plaintiff was not disabled due to a physical condition, but *was* disabled due to a mental condition. In the Final Denial Letter, on the other hand, defendant determined that plaintiff was neither disabled due to a physical condition nor disabled due to a mental condition.

As the Fourth Circuit made clear in *Gagliano v. Reliance Standard Life Insurance Company*, ERISA requires that claimants be provided with a full and fair review, including "the opportunity for the claimant to appeal the adverse benefits determination and to submit written

comments or records." 547 F.3d 230, 235 (4th Cir. 2008).[12] This statutory requirement extends to any new grounds for adverse benefits determinations given in final denial letters because those new grounds are effectively initial denials on the new grounds. *See id*. at 236. Here, defendant failed to give plaintiff the requisite opportunity to appeal administratively the finding that plaintiff was not disabled due to a mental condition, thereby violating ERISA's procedural requirements. As the Fourth Circuit articulated in *Gagliano*, such a violation requires "remand to the plan administrator for the 'full and fair review' to which [plaintiff] is entitled." *Id*. at 241.[13]

Seeking to avoid this result, defendant claims that its determination that plaintiff was not disabled due to a mental condition was warranted because plaintiff himself has consistently denied being disabled due to a mental condition. Although it is true that plaintiff has firmly denied being disabled due to a mental condition,[14] that fact does not eliminate ERISA's notice requirement. As the Fourth Circuit made clear in *Gagliano*, ERISA requires that defendant give plaintiff an opportunity to appeal administratively defendant's conclusion that plaintiff was not disabled due to a mental condition in order to "protect a plan participant from arbitrary or unprincipled decision-making." 547 F.3d at 235 (quoting *Weaver v. Phoenix Home Life Mut. Ins. Co.,* 990 F.2d 154, 157 (4th Cir. 1993)). Defendant failed to give plaintiff such an opportunity here.

[12] *See also* 29 C.F.R. § 2560.503–1(h)(2)(ii)–(iv) (2008) ("[T]he claims procedures of a plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless the claims procedures . . . [p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.").

[13] The Fourth Circuit has articulated that reinstatement of benefits rather than remand would be the appropriate remedy only where "the record establishes that the plan administrator's denial of the claim was an abuse of discretion as a matter of law." *Gagliano*, 547 F.3d at 240. Because that is not the case here, remand is appropriate.

[14] *See, e.g.*, Pl. Letter with Additional Material for the Appeal, Aug 2, 2019, AR 806, 812 (stating that the fact that plaintiff had failed to provide proof of loss regarding any disability due to mental condition was "not at all surprising for someone who does not suffer from a mental health condition").

Defendant further claims that any appeal as to the validity of defendant's determination regarding mental disability has not been administratively exhausted because plaintiff has not appealed the February 5, 2018 termination of LTD benefits. Defendant's contention is clearly mistaken. In the Final Denial Letter, defendant explicitly wrote that the February 5, 2018 claim decision had been "rendered moot." Final Denial Letter, Aug. 30, 2019, AR 344, 349. Thus, the Final Denial Letter effectively exhausted plaintiff's administrative remedies for both the physical and the mental disability determinations.

In sum, because defendant has not provided plaintiff with full and fair review of defendant's determination that plaintiff was not disabled due to mental condition, that determination must be remanded to the administrator for full and fair administrative review.

**IV.**

With respect to defendant's determination that plaintiff was not disabled due to a physical condition, the principles elucidated above point persuasively to the conclusion that defendant did not abuse its discretion in determining that plaintiff was not disabled due to a physical condition. And because defendant's determination was the result of a deliberate, principled reasoning process and supported by substantial evidence, that determination will not be disturbed.

Moreover, the eight *Booth* factors, applied here, clearly support the conclusion that defendant did not abuse its discretion in determining that plaintiff was not disabled due to a physical condition, and then later upholding that determination.

**1. Language of the Plan**

The language of the Group Policy supports defendant's determination that plaintiff was not disabled due to a physical condition. The Group Policy defines disability as being prevented by

"(1) accidental bodily injury; (2) sickness; (3) Mental Illness; (4) Substance Abuse; or (5) pregnancy, from . . . from performing one or more of the Essential Duties of Your Occupation . . . . After [the first 60 months], You must be so prevented from performing one or more of the Essential Duties of Any Occupation." Group Policy, AR 1855. In both the Initial Denial Letter and the Final Denial Letter, defendant found that plaintiff was not disabled due to a physical disability from performing one or more of the essential duties of any occupation. *See* Initial Denial Letter, AR 373; Final Denial Letter, AR 344. Furthermore, plaintiff has not presented any argument concerning the language of the Group Policy. Defendant's determination is therefore supported by the language of the Group Policy.

**2. Purpose of the Plan**

The purpose and goal of the Group Policy also supports defendant's determination. The Group Policy's purpose is to provide benefits in accordance with the guidelines of the plan and in compliance with ERISA. Here, defendant applied the language of the Group Policy and found after a full and fair impartial review that plaintiff was not disabled due to a physical condition under that language, thus supporting the purpose and goal of the Group Policy.

**3. Adequacy of Materials Considered and Degree to Which Materials Support the Plan Administrator's Determination**

The materials considered to make the decision were substantial and supported defendant's determination that plaintiff was not disabled due to a physical condition. Defendant considered an ample administrative record in making its determination. When defendant made its initial determination, that record included medical records and reports from at least six medical professionals in addition to extensive administrative correspondence between defendant and plaintiff. When defendant made its final determination, that record had expanded to include

independent medical record reviews from four additional doctors. Although several medical experts reported that plaintiff continued to be totally disabled due to a physical condition, substantial evidence supported defendant's determination that plaintiff was not disabled due to physical disability. Defendant's determination was supported by the defense medical examination performed by Dr. Hope, the independent medical examination performed by Dr. Spector, and the independent medical reviews conducted by Dr. Sebesto, Dr. White, and Dr. Sautter.

In a defense medical examination on April 22, 2016, Dr. Hope reported that he saw "no evidence whatsoever of manifestation of pain" despite plaintiff's assertion to the contrary. Medical Examination of Donald G. Hope, M.D., AR 1382, 1383. After reviewing plaintiff's part medical history, Dr. Hope concluded that plaintiff "appear[ed] fully capable of work in his pre[-]accident capacity with regard to injuries sustained. I would impose a 40hr [sic] work week max but place these restrictions based on his current psychological state and consider these ongoing restrictions unrelated to the subject accident." *Id.* at AR 1398.[15]

In his report on the independent medical examination of plaintiff performed on October 12 and 15, 2018, Dr. Spector reported that plaintiff was "obstreperous and agitated" through much of the medical exam and refused to answer a number of questions. Neuropsychological Evaluation Report of Jack Spector, Ph.D., AR 1008, 1009. Dr. Spector further reported that plaintiff "never seemed far from quitting the present examination all together, which in turn kept [Dr. Spector]

---

[15] Plaintiff argues that the fact that defendant continued to grant benefits after originally receiving Dr. Hope's examination effectively means that defendant cannot take Dr. Hope's conclusions into account in defendant's later adverse determination. Plaintiff's contention in this regard is contrary to reason. In determining whether to grant or deny benefits, defendant can and should take all of a claimant's medical history into account. And although a single examination favoring an adverse determination may not be persuasive, if, as occurred here, evidence continues to present itself that an adverse determination is appropriate, plan administrators can and should take every piece of evidence into account.

from pressing [plaintiff] during interview." *Id*. Moreover, during psychological and cognitive testing, plaintiff was observed to "exaggerate[] cognitive and functional impairment." *Id*. at AR 1014.[16] Dr. Spector concluded that plaintiff "appear[ed] to have sustained no worse than a mild traumatic brain injury in his 2012 motor vehicle accident." *Id*. at AR 1018. Additionally, Dr. Spector concluded that plaintiff would not be able to function in a workplace, but determined that "pre-existing or characterologic psychiatric factors are the primary cause of what impairments exists," which Dr. Spector believed "pre-existed or are unrelated to [plaintiff's] injury." *Id*. In summary, Dr. Spector "d[id] not believe[] that the uncomplicated concussion [plaintiff] *might* have sustained in 2012 [wa]s in any way responsible for [plaintiff's] current symptoms, complaints, and performance." *Id*. (emphasis in original).

In their independent medical record reviews conducted on August 21 to 22, 2018, Dr. Sebesto, Dr. White, and Dr. Sautter all questioned the idea that plaintiff was suffering from a traumatic brain injury and concluded that plaintiff could sustain a standard 40-hour work week.

In his review, Dr. Sautter found that there were "significant inconsistencies throughout the record regarding the uncomplicated concussion," which Dr. Sautter claimed "do not result in persistent post-concussion symptoms." Medical Record Review of Scott W. Sautter, Ph.D., Aug. 22, 2019, AR 657, 661. Therefore, Dr. Sautter concluded that there was "no substantive evidence" to support cognitive or behavioral health restrictions and limitations. *Id*. at 660.

In Dr. Sebesto's examination, Dr. Sebesto asserted that plaintiff's medical record "contain[ed] no documented evidence of impairment of the claimant's neurologic function, and therefore, no restrictions/limitations are supported." Medical Record Review of Jason Sebesto,

---

[16] Despite the fact that plaintiff "did not consistently exhibit his best possible performance during testing," Dr. Spector concluded that plaintiff was not malingering or feigning impairment. *Id*.

D.O., Aug. 21, 2019, AR 663, 666.

In Dr. White's review, Dr. White found that Dr. Porvaznik's opinion regarding plaintiff's functionality and plaintiff's self-reported inability to work were "inconsistent with the clinical findings." Medical Record Review of Sarah M. White, M.D., Aug. 21, 2019, AR 669, 673. Dr. White found that plaintiff's abilities were sustainable for a forty-hour work week with a minor limitation related to defendant's reported pain.[17]

In summary, defendant's determination that plaintiff was not disabled due to a physical condition is amply supported by substantial record evidence and by each of the independent medical reviews conducted by Drs. Sautter, Sebesto, and White.

Seeking to avoid this outcome, plaintiff argues that there is also evidence that plaintiff was disabled due to physical disability caused by the car accident. Plaintiff's argument fails. Although it is true that several medical professionals concluded that plaintiff was disabled due to physical disability,[18] defendant is not required to accept those findings over the conclusions of other experts. As the Fourth Circuit has made clear, "the plan administrator's decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Bernstein*, 70 F.3d at 788. Additionally, the Fourth Circuit has explained that substantial evidence is "more than a scintilla but less than a preponderance." *Newport News*

---

[17] Plaintiff argues that none of the reviewers relied on by defendant evaluated plaintiff's complaints of pain. This argument is clearly incorrect. Indeed, Dr. White evaluated plaintiff's complaints of pain and weighed them against Dr. Hope's observation that "there was no evidence of pain" during his examination of plaintiff. *Id.* at AR 671. Dr. White then concluded on the basis of plaintiff's pain and back problems that plaintiff should be limited to "lifting, carrying, pushing, and pulling up to 25 pounds occasionally and 10 pounds frequently." *Id.* at 672.

[18] *See, e.g.*, Letter from Michael Porvaznik, D.O., to Defendant, Nov. 29, 2018, AR 972, 974-75 ("[I]n my clinical judgment [plaintiff] suffered a TBI in the accident of March 1, 2012. It was severe and [plaintiff's] life is altered to this day. In my opinion [plaintiff] is disabled and unable to work."); Medical Record Review of Jeffrey Wilken, Ph.D., July 11, 2019, AR 826, 839 (concluding that plaintiff "experienced a concussion as a result of his 2012 [car accident] that resulted in neurocognitive decline, behavioral deterioration, and psychiatric/psychological impairment").

*Shipbuilding & Dry Dock Co.*, 326 F.3d at 452. Defendant's determination was clearly supported by the substantial record evidence that Dr. Hope, Dr. Spector, Dr. Sautter, Dr. Sebesto, and Dr. White all concluded that plaintiff was not disabled due to a physical condition.

**4. Consistency of the Plan Administrator's Interpretation with the Plan and with Past Interpretations of the Plan**

Defendant's determination that plaintiff was not disabled due to a physical condition was consistent with the provisions of the Group Policy. Moreover, although the determination marked a shift in application of defendant's interpretation of the Group Policy, the determination was nonetheless consistent with both the language and past interpretations of the plan.

In making its determination that plaintiff was not disabled due to a physical condition, defendant applied the Group Policy's definition for disability and found, based on a review of plaintiff's complete record, including Dr. Spector's examination, Dr. Hope's examination, and the reviews of Drs. Sebesto, White, and Sautter, that plaintiff did not meet the definition for disability based on a physical condition. This determination is clearly consistent with the provisions of the Group Policy. In making that determination, defendant changed its interpretation of plaintiff's conditions and determined that plaintiff's disability was due to a mental condition and was no longer attributable to the car accident.[19] This change represents a response to additional evidence—first Dr. Spector's examination and then the reviews of Drs. Sautter, Sebesto, and White—and is not inconsistent with defendant's previous conclusion that plaintiff was eligible for LTD benefits. Thus, defendant's later conclusion that plaintiff was no longer eligible for LTD

[19] As discussed above, defendant's later determination in the Final Denial Letter that plaintiff was also not disabled due to a mental condition did not meet the requirement of ERISA that claimants be given an opportunity to appeal administratively adverse benefit determinations. This analysis, therefore, focuses solely on defendant's determination that plaintiff was not disabled due to a physical condition.

benefits is fully consistent with the Group Policy as well as defendant's past interpretations of the Group Policy.

**5. Whether the Decision-Making Process was Reasoned and Principled**

The record makes clear that defendant's decision-making process was both reasoned and principled. As noted in detail above, defendant based its decision on substantial evidence that supported defendant's determination that plaintiff was not disabled due to a physical condition. Additionally, defendant employed a reasoned and principled decision-making process to arrive at that decision.

From defendant's original determination that plaintiff was disabled due to a physical disability to defendant's review of the claim five years later, the record reflects that defendant's decision-making process was thorough, reasoned, and principled. From April 2013 to November 2018, defendant determined that plaintiff was eligible for LTD benefits due to a physical disability. Defendant based these continuing determinations on medical records and reports from Jon Peters, M.D. and Michael Porvaznik, D.O., among others. When defendant received the medical report of Donald Hope, M.D., which conflicted with defendant's determination that plaintiff was disabled due to a physical disability, defendant did not immediately alter its determination and cease granting benefits. Instead, it appears that defendant sought more information from plaintiff's physicians and based on that additional information, continued to find plaintiff eligible for benefits due to a physical condition. *See* Defendant Benefit Management System Notes, AR 166-207.

Additionally, defendant's determination that plaintiff was not disabled due to a physical condition in the Initial Denial Letter and Final Denial Letter were based on a thorough, reasoned, and principled decision-making process. On July 26, 2018, defendant initiated a review of

plaintiff's case to determine whether plaintiff continued to be eligible for LTD benefits under the more stringent definition of disability that applied after the first five years of LTD benefits under the terms of the Group Policy. As part of that review, defendant arranged for an independent medical examination of plaintiff through a third-party. The results of that review, conducted by Dr. Spector, reinforced the position forwarded by Dr. Hope that plaintiff was not disabled due to a physical condition. Defendant then conducted an employability analysis based on Dr. Spector's examination and determined that there existed numerous occupations in the national economy that plaintiff could perform. Based on that evidence and a review of plaintiff's record as a whole, defendant determined in the Initial Denial Letter that plaintiff was not disabled due to a physical condition. Plaintiff appealed that decision and provided an independent medical review report that agreed with plaintiff's position that plaintiff was disabled due to a physical condition. Defendant then conducted an appeal review through a separate appellate claims specialist. As part of the review, defendant requested three independent reviews of plaintiff's medical records. All three reviews determined that plaintiff was not disabled due to a physical condition.[20] Defendant prepared an addendum to its employability analysis based on those medical reviews, and defendant concluded that there existed numerous occupations in the national economy that plaintiff could perform. Based on all of the evidence on the administrative record, defendant's appellate claims specialist determined that plaintiff was not disabled due to a physical condition.

From the thorough decision-making process defendant followed and the numerous steps defendant took to obtain expert reports and examinations of plaintiff, it is clear that defendant's

[20] *See* Medical Record Reviews of Jason Sebesto, D.O., Sarah M. White, M.D., and Scott W. Sautter, Ph.D., AR 657-73. Dr. White determined that plaintiff required certain weight limitations based on his continuing back pain, but concluded that plaintiff was otherwise able to work a normal work week.

decision-making process was reasoned and principled.

**6. Consistency of Decision with Procedural and Substantive Requirements of ERISA**

Defendant's determination that plaintiff was not disabled due to physical disability was also fully consistent with ERISA's procedural and substantive requirements. In this regard, plaintiff presents no persuasive evidence that defendant's determination violated the requirements of ERISA. As noted above, defendant did not provide notice to plaintiff regarding defendant's determination as to whether plaintiff was disabled due to a mental condition and thus violated the notice requirement of ERISA.[21] However, with respect to defendant's determination that plaintiff was not disabled due to a physical condition, defendant provided plaintiff with both notice of defendant's determination and opportunity to appeal that determination. Defendant's determination that plaintiff was not disabled due to a physical condition was thus consistent with the requirements of ERISA.

**7. External Standard Relevant to the Exercise of Discretion**

There is no record evidence that any external standards of review apply to this case. Therefore, this factor has no impact on the analysis.

**8. Plan Administrator's Motives and Any Potential Conflicts of Interest**

Defendant's structural conflict of interest in making its claim determination as both the claim reviewer and the claim payor does not make the determination illegitimate. Although defendant has a structural conflict of interest as both the claim reviewer and the claim payor in this case, defendant has constructed adequate safeguards to reduce the impact of the conflict of interest on claim decisions. As the Supreme Court has stated in this regard, "[a conflict of interest] should

---

[21] *See Gagliano*, 547 F.3d at 236; *see also supra*, Section III.

prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008). Here, defendant has taken such steps to reduce potential bias.

In that respect, defendant's employees who make claims decisions are paid salaries that are unrelated to the amount or number of claims paid or denied, and are not given quotas or guidelines regarding claim payments or denials. *See* Declaration of Mary E. Roman, ¶¶ 23-24, Dkt. 13, Ex. 2. Additionally, defendant's employees are evaluated based on the quality of their claim decisions. *Id.* ¶ 25. Moreover, defendant's appeals unit, which is charged with making an independent assessment of the claim decision based on all the evidence in the claim file, is separate from the claims unit that makes initial claims determinations. *Id.* ¶¶ 27-28. Indeed, in this case, the employee handling the appeal did not discuss plaintiff's claim with the employee who made the initial decision. *Id.* ¶ 29. Additionally, defendant's claims and appeal units are separate business units from the financial underwriters. *Id.* ¶ 31. Furthermore, there is no persuasive record evidence suggesting that defendant's determination was motivated by defendant's structural conflict of interest.[22] Therefore, although defendant has a structural conflict of interest, defendant has "taken active steps to reduce potential bias and to promote accuracy," making this factor less important to the analysis under the *Booth* factors. *Glenn*, 554 U.S. at 117.

*　　　*　　　*

In conclusion, because defendant's determination that plaintiff was no longer disabled due

[22] Plaintiff contends that defendant's adverse decision, is evidence that defendant's conflict of interest infected the decision-making process. This argument is clearly meritless. As discussed above, defendant's decision-making process was reasoned, principled, and based on substantial evidence. The mere fact that plaintiff disagrees with the outcome of defendant's decision-making process is plainly insufficient to render the process illegitimate.

to a physical disability was "the result of a deliberate, principled reasoning process" and "supported by substantial evidence," the decision must be upheld. *Bernstein,* 70 F.3d at 788. The language and purpose of the Group Policy, the evidence considered by defendant, and the adequacy and thoroughness of defendant's decision-making process all support defendant's determination. Neither the fact that defendant changed its determination after five years of granting benefits nor defendant's structural conflict of interest require altering this outcome. Moreover, defendant's determination that plaintiff was not disabled due to a physical condition is consistent with the equirements of ERISA. In summary, the *Booth* factors and Fourth Circuit precedent point persuasively to the conclusion that defendant did not abuse its discretion in determining that plaintiff was not disabled due to a physical condition.

**V.**

Plaintiff also moves for an award of attorney's fees and costs. ERISA provides that "a district court may, in its discretion, award costs and reasonable attorneys' fees to either party under 29 U.S.C. § 1132(g)(1), so long as that party has achieved some degree of success on the merits." *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 634 (4th Cir. 2010). The Fourth Circuit has made clear that district courts should consider the following five factors when determining whether attorneys are entitled to costs and attorney's fees:

> (1) degree of opposing parties' culpability or bad faith;
>
> (2) ability of opposing parties to satisfy an award of attorneys' fees;
>
> (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances;
>
> (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and

(5) the relative merits of the parties' positions.

*Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1029 (4th Cir. 1993)

Applied here, these factors point convincingly to the conclusion that attorney's fees should not be granted. Although defendant failed to provide plaintiff with a meaningful opportunity to challenge the determination that plaintiff was not disabled due to a mental condition, defendant reasonably based that conclusion on defendant's expert reports and on plaintiff's own contention that plaintiff was not disabled due to a mental condition. Defendant's determination was therefore not made in bad faith. Accordingly, there is no significant need to create a strong deterrent against this kind of behavior in the future. Moreover, although plaintiff's argument that defendant failed to provide notice prevailed, the result is remand to defendant for further adjudication. Defendant, meanwhile, has prevailed on all other grounds. Thus, attorney's fees and costs are not appropriate.

An appropriate Order will issue separately.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

Alexandria, Virginia
March 11, 2021

/s/
T. S. Ellis, III
United States District Judge